**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Atlantic Recording Corporation, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> ) <br> Pamela and Jeffrey Howell, wife and ) <br> husband, ) <br> ) <br> Defendants. ) <br> ) | No. CV-06-02076-PHX-NVW <br><br> **ORDER** |

The court has before it Plaintiffs' Motion for Summary Judgment. (Doc. # 30.) The Motion will be denied for the reasons set forth below.

**I.   Background**

This is a suit for copyright infringement brought by seven major recording companies against Defendant Jeffery Howell ("Howell") and his wife, who proceed pro se. At 1:52 a.m. Eastern Time on January 30, 2006, the recording companies' private investigator, MediaSentry, logged on to the KaZaA file-sharing system and detected a user account with over 4,000 files available for download. (Doc. # 31, Ex. 11 ¶ 9.) MediaSentry took screenshots (images of a computer screen display) showing the files that were available for download from the user's computer, many of which were sound recordings. (Doc. # 31, Ex. 10.) It is uncontested that the recording companies own registered copyrights in 54 of those sound recordings. MediaSentry downloaded 12 of the copyrighted songs from the computer. (Doc. # 63, Ex. A ¶ 6.) The recording companies'

1  expert determined that the music had originally been downloaded from other users on the
2  Internet. (Doc. # 31, Ex. 12 ¶ 22.)
3        The recording companies traced the computer to Howell and his wife and filed this
4  action for copyright infringement. At the close of discovery, they moved for summary
5  judgment that Howell violated their exclusive right to distribute the 54 copyrighted sound
6  recordings. They attached seven pages of their April 4, 2007 deposition of Howell. Their
7  briefs maintained that Howell admitted at the deposition that "all of the sound recordings
8  [at issue] were in the KaZaA shared folder that he created on his computer," (doc. # 30 at
9  8), and that he made "the affirmative choice to use KaZaA to share files" (doc. # 38 at 3).
10 The portion of the deposition that the recording companies provided appeared to support
11 their allegation and Howell did not submit any additional portions of the deposition with
12 his response. (Doc. # 31, Ex. 9.) The court granted the motion for summary judgment.
13 (Doc. # 43.)
14       Howell then submitted a motion to reconsider, asserting that he had never stated
15 that the sound recordings were in the publically accessible KaZaA folder ("shared
16 folder") and attaching portions of the deposition that appeared to contradict the recording
17 companies' claim that he had admitted to sharing the sound recordings. (Doc. # 47.) The
18 court granted his motion and called for further briefing. Additional portions of the
19 Howell deposition later submitted by the recording companies showed that Howell had
20 not, in fact, admitted to placing the sound recordings in the KaZaA shared folder:

21     Q:        [Y]ou would agree with me that when KaZaA ran on your
22                      computer, you were automatically sharing your KaZaA files
                         with anyone who wanted to download them?

23     [Howell]:  Yes.

24     Q:        And this includes any songs that you copied from your own
25                      CDs on to your computer that were placed in your KaZaA
                       folder?

26     [Howell]:  No. That should not have ever happened.

27             . . .

28

|   |   |   |
|---|---|---|
| | | because it should have only been sharing the shared folder and in the shared folder was pornography and free to the public software, e-books. |
| | Q: | And why didn't you place your music in your shared folder? |
| | [Howell]: | Because that's not where it belongs. It belongs in my music folder. |
| | | . . . |
| | Q: | Now did you – were [the files being shared] files that you put in your KaZaA program but not in a shared folder? |
| | [Howell]: | No. They had never had any – there was nothing to do with KaZaA whatsoever. |
| | | . . . |
| | | That's what I've been pointing out ever since the very first conversation. It has files from my personal folder, from my music folder, from my shared folder and god knows else where. |
| | | . . . |
| | Q: | [A]nd you acknowledge now that you were sharing sound files on KaZaA for anyone to download? |
| | [Howell]: | I was not, no. The computer was, but I was not. |
| | | . . . |
| | | The computer in some form, all right? Whether it was a malfunction of the program or a tampering by a third party or even Windows itself going back to a previous edition or whatever like that – made files that I did not know available on the Internet – |
| | | . . . |
| | | – which included music folder. |

(Doc. # 80, Ex. A at 145–49.)

To summarize, Howell admitted that he created the KaZaA account and username that MediaSentry identified, that he installed the KaZaA file-sharing program on the computer, and that he authorized certain types of files to be shared through KaZaA. (Doc. ## 31, Ex. 9 at 164–65, 208–10; 63, Ex. C at 139.) However, he denied having

- 3 -

1 placed the copyrighted sound recordings in the KaZaA shared folder or having otherwise
2 authorized sharing of those files.  (Doc. # 63, Ex. C at 170.)  According to Howell, the
3 screenshots taken by MediaSentry show that the KaZaA program was, without his
4 authorization, granting public access to files on his computer that were not in the shared
5 folder.  (*Id.* at 173.)  He also testified that there were other people who had access to the
6 computer and the KaZaA user account that could be responsible for the recordings having
7 been publicly available for download.  (*Id.* at 99, 105, 162.)  He further denied that he
8 originally downloaded the copyrighted sound recordings through KaZaA.  (Doc. # 80, Ex.
9 A at 182–83.)  Rather, he claimed to own compact discs containing the sound recordings
10 at issue and to have copied the recordings to his computer for personal use.  (*Id.* at
11 114–116.)

## II. Standard of Review

Rule 56(c), Fed. R. Civ. P., provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  A "genuine issue" of material fact will be absent if, "viewing the evidence and inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law." *Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308, 1310 (9th Cir. 1977); *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1111 (9th Cir. 2001).  Any supporting facts presented by the parties must be admissible into evidence. Fed. R. Civ. P. 56(e).  Conclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

- 4 -

1 affidavits, if any, which it believes demonstrate the absence of any genuine issue of
2 material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nature of
3 this responsibility varies, however, depending on whether the movant or the non-movant
4 would bear the burden of persuasion at trial with respect to the issue at hand. If, as here,
5 the burden of persuasion at trial would be on the party moving for summary judgment,
6 that party may satisfy its initial burden of production only by showing that it would be
7 "entitle[d] . . . to a directed verdict if the evidence went uncontroverted at trial."
8 *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *cf. Berry v. Bunnell*, 39 F.3d
9 1056, 1057 (9th Cir. 1994) ("A directed verdict is proper when the evidence permits only
10 one reasonable conclusion.").

11 Where the moving party has met its initial burden with a properly supported
12 motion, the party opposing the motion "may not rest upon the mere allegations or denials
13 of his pleading, but . . . must set forth specific facts showing that there is a genuine issue
14 for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary
15 judgment is appropriate against a party who "fails to make a sufficient showing to
16 establish the existence of an element essential to that party's case, and on which that party
17 will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *Matsushita Elec.*
18 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmovant's showing of
19 "some metaphysical doubt" as to material facts insufficient); *see also Citadel Holding*
20 *Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). Summary judgment is not appropriate
21 when the nonmoving party identifies or produces evidence from which a reasonable juror,
22 drawing all inferences in favor of the nonmoving party, could return a verdict in the
23 nonmoving party's favor. *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir.
24 1999).

25 **III.   Analysis**

26 Under 17 U.S.C. § 501(a), "[p]laintiffs must satisfy two requirements to present a
27 prima facie case of direct infringement: (1) they must show ownership of the allegedly

- 5 -

infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

### A. Plaintiffs Have Established Copyright Ownership

The recording companies' ownership of valid copyrights to the sound recordings is not in dispute. Affidavits establish that they held valid, registered copyrights effective prior to the date on which the sound recordings were found in the "jeepkiller@kazaa" shared folder. (Doc. # 31, Ex. 4–7.) In his deposition, Howell stated that he "[did not] agree with the law" that the recording companies own the copyrights, but he also "[did not] dispute that they own them." (Doc. # 31, Ex. 9 at 252.) Thus, the first element of the recording companies' claim of copyright infringement has been satisfied.

### B. Plaintiffs Have Not Established Unlawful Distribution

Section 106(3) of the Copyright Act of 1976 grants to "the owner of copyright . . . the exclusive rights to . . . distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). The statute does not define the term "distribute," so courts have interpreted the term in light of the statute's plain meaning and legislative history. The general rule, supported by the great weight of authority, is that "infringement of [the distribution right] requires an actual dissemination of either copies or phonorecords." *Nat'l Car Rental Sys. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993). *See also Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 718 (9th Cir. 2007) ("[T]he district court's conclusion [that distribution requires an 'actual dissemination'] is consistent with the language of the Copyright Act."); *London-Sire Records, Inc. v. Doe 1*, No. 04cv12434-NG, ____ F. Supp. 2d ____, 2008 WL 887491, at *10 (D. Mass. Mar. 31, 2008); *Musical Prods., Inc. v. Roma's Record Corp.*, No. 05-CV-5903(FB)(VVP), 2007 U.S. Dist. LEXIS 16064, at *3, 2007 WL 750319, at *1 (E.D.N.Y. Mar. 7, 2007); *In re Napster, Inc. Copyright Litig.*, 377 F.Supp. 2d 796, 802 (N.D. Cal. June 1, 2005) (listing

1  authority "that supports [the] view that distribution of a copyrighted work requires the
2  transfer of an identifiable copy of that work."); *Paramount Pictures Corp. v. Labus*, 1990
3  U.S. Dist. LEXIS 11754, at *14, 1990 WL 120642, at *4 (W.D. Wis. Mar. 23, 1990); 2
4  DAVID NIMMER & MELVILLE B. NIMMER, NIMMER ON COPYRIGHT § 8.11[A], at 8-149
5  (2007) ("Infringement of [the distribution right] requires an actual dissemination of either
6  copies or phonorecords."); 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 13:9, at 13-13
7  (2007) ("Without actual distribution of copies of the [work], there is no violation of the
8  distribution right."); 2 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 7.5.1, at 7:125 to
9  7:126 (3d ed. 2005) ("[A]n actual transfer must take place; a mere offer for sale will not
10 infringe the right.").

11     The recording companies have provided evidence that their own investigator
12 downloaded 12 of the copyrighted sound recordings from Howell's computer. They have
13 provided no evidence that their investigator or any KaZaA user ever downloaded any of
14 the other 42 copyrighted sound recordings. Nevertheless, the recording companies argue
15 that such evidence is unnecessary to prove a violation of their distribution rights under §
16 106(3). They assert that Howell violated their distribution right in the sound recordings
17 merely by making them available for the public to copy.

**1. Merely making a copy available does not constitute distribution**

19     The recording companies primarily rely upon the decision of the Court of Appeals
20 for the Fourth Circuit in *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118
21 F.3d 199 (4th Cir. 1997). *Hotaling* involved a library that made several unlawful copies
22 of the plaintiff's copyrighted work and sent them to its branch offices around the country.
23 *Id.* at 201. The public was unable to check out the unlawful copies because they were in
24 microfiche form, but could use them within the libraries. *Id.* at 205. The library did not
25 keep records on the public's use of noncirculating microfiche, so the plaintiff was unable
26 to prove that anyone had actually used the unlawful copies. The defendant library

1  therefore argued that, at most, the plaintiff had proven only an offer to distribute the
2  copyrighted material, not actual distribution. *Id.* at 203.

3        The court disagreed. It acknowledged that ordinarily "a party must show that an
4  unlawful copy was disseminated 'to the public.'" *Id.* (citing *Nat'l Car Rental Sys.*, 991
5  F.2d at 434; 2 NIMMER, supra, § 8.11[A] (1996)). In the library's case, however, proof of
6  specific instances of use by the public was "impossible to produce because the infringing
7  library ha[d] not kept records of public use." *Id.* at 204. If the court were to require proof
8  of specific instances of public use in that situation, "a copyright holder would be
9  prejudiced by a library that does not keep records of public use, and the library would
10  unjustly profit by its own omission." *Id.* at 203. The court thought it important that the
11  plaintiff had already proven that the library made unlawful copies and placed them in its
12  branch libraries. It deemed the library to have distributed those unlawful copies when it
13  "list[ed] the work in its index or catalog system, and [made] the work available to the
14  borrowing or browsing public." *Id.*

15        Our circuit has not applied *Hotaling* to impose directly liability on persons making
16  unauthorized copies of copyrighted works available to the public through online file-
17  sharing systems. The recording companies point to language in *A&M Records, Inc. v.*
18  *Napster, Inc.*, where the court stated that "Napster users who upload file names to the
19  search index for others to copy violate plaintiffs' distribution rights." 239 F.3d at 1014.
20  The court cited no precedent and offered no analysis in explanation of that statement. Its
21  review of the issue was cursory because neither party disputed that Napster users were
22  using the system to disseminate actual, unauthorized copies of copyrighted works to the
23  public. *Id.* The central issue in the case was secondary liability for the creators of the
24  Napster file-sharing system.

25        In a later case, *Perfect 10, Inc. v. Amazon.com, Inc.*, the court grouped the holdings
26  of *Hotaling* and *Napster* together based upon a factual similarity; in both cases "the
27  owner of a collection of works . . . [made] them available to the public." 487 F.3d at

- 8 -

1  718. Only in such a situation could the holding of *Hotaling* potentially apply to relieve
2  the plaintiff of the burden to prove actual dissemination of an unlawful copy of the work.
3  The defendant in the case did not own a collection of copyrighted works or communicate
4  them to the public, so the court found *Hotaling* inapplicable.  However, the court did hold
5  that "the district court's conclusion [that distribution requires an 'actual dissemination'] is
6  consistent with the language of the Copyright Act." *Id.*  That holding contradicts
7  *Hotaling* and casts doubt on the single unsupported line from *Napster* upon which the
8  recording companies rely.

9  District courts have struggled to determine whether the requirement to prove actual
10 dissemination or *Hotaling* should apply to cases of alleged copyright infringement
11 through online file-sharing. *Interscope Records v. Leadbetter*, No. C05-1149-MJP-RSL,
12 2007 U.S. Dist. LEXIS 29818, at *9–13, 2007 WL 1217705, at *3–4 (W.D. Wa. Apr. 23,
13 2007) (noting but declining to resolve the tension).  The majority of district courts have
14 rejected the recording companies' "making available" theory because *Hotaling* is
15 inconsistent with the Copyright Act. *Elektra Entm't Group, Inc. v. Barker*, No.
16 05-CV-7340 (KMK), 2008 U.S. Dist. LEXIS 25913, at *25, 2008 WL 857527, at *6
17 (S.D.N.Y. Mar. 31, 2008) ("Respectfully, *Hotaling* did not cite any precedent in holding
18 that making copyrighted works available to the public constitutes infringement . . . [its]
19 interpretation, even if sound public policy, is not grounded in the statute.); *London-Sire*
20 *Records, Inc.*, 2008 WL 887491, at *9 (noting a "lacuna in the Fourth Circuit's
21 reasoning" because "[i]t is a 'distribution' that the statute plainly requires"); *In re.*
22 *Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d at 803 (declining to apply *Hotaling*
23 because it is contrary to the weight of authority and "inconsistent with the text and
24 legislative history of the Copyright Act of 1976"); *Arista Records, Inc. v. MP3Board,*
25 *Inc.*, 00 Civ. 4660 (SHS), 2002 U.S. Dist. LEXIS 16165, at *13–14, 2002 WL 1997918,
26 at *4 (S.D.N.Y. Aug. 29, 2002) (declining to apply *Hotaling* because the record

1 companies had not shown that proof of particular instances of use by the public was
2 "impossible to produce").

3    Two courts have concluded that making a work available on a file-sharing network
4 does constitute distribution. *Universal City Studios Prods. LLP v. Bigwood*, 441 F. Supp.
5 2d 185, 190–91 (D. Me. 2006); *Motown Record Co. v. DePietro*, No. 04-CV-2246, 2007
6 U.S. Dist. LEXIS 11626, at *12, 2007 WL 576284, at *3 (E.D. Pa. Feb. 16, 2007). More
7 frequently, courts have refused to grant defendants' motions to dismiss where the
8 plaintiffs did not prove actual distribution, but have stopped short of approving the
9 "making available" theory. *See, e.g.*, *Interscope Records v. Duty*, No.
10 05-CV-3744-PHX-FJM, 2006 U.S. Dist. LEXIS 20214, at *8 n.3, 2006 WL 988086, at *3
11 n.3 (D. Ariz. Apr. 14, 2006) ("To be clear, we do not conclude that the mere presence of
12 copyrighted sound recordings in Duty's share file constitutes copyright infringement. We
13 have an incomplete understanding of the Kazaa technology at this stage."); *Arista*
14 *Records LLC. v. Greubel*, 453 F. Supp. 2d 961, 971 (N.D. Tx. 2006) (denying the motion
15 to dismiss "[g]iven that the complaint must be liberally construed in favor of Plaintiffs at
16 this stage of the proceedings."); *Warner Bros. Records, Inc. v. Payne*, No. W-06-CA-051,
17 2006 U.S. Dist. LEXIS 65765, at *11, 2006 WL 2844415, at *4 (W.D. Tx. 2006) ("[T]he
18 Court is not prepared at this stage of the proceedings to rule out the Plaintiffs' 'making
19 available' theory as a possible ground for imposing liability.").

20    The court agrees with the great weight of authority that § 106(3) is not violated
21 unless the defendant has actually distributed an unauthorized copy of the work to a
22 member of the public. The statute provides copyright holders with the exclusive right to
23 distribute "copies" of their works to the public "by sale or other transfer of ownership, or
24 by rental, lease, or lending." 17 U.S.C. § 106(3). Unless a copy of the work changes
25 hands in one of the designated ways, a "distribution" under § 106(3) has not taken place.
26 Merely making an unauthorized copy of a copyrighted work available to the public does
27 not violate a copyright holder's exclusive right of distribution.

28

As *Hotaling* seems to suggest, evidence that a defendant made a copy of a work available to the public might, in conjunction with other circumstantial evidence, support an inference that the copy was likely transferred to a member of the public. *See London-Sire Records, Inc.*, 2008 WL 887491, at *10 ("The Court can draw from the Complaint and the current record a reasonable inference . . . that where the defendant has completed all the necessary steps for a public distribution, a reasonable fact-finder may infer that the distribution actually took place."); PATRY, supra, § 13:9 at 13-15 ("The majority's decision [in *Hotaling*] can be saved only if it is read to rest on an evidentiary probability that there had been an actual loan of the copy."). On its own, however, it does not prove that the copy changed hands. It only shows that the defendant attempted to distribute the copy, and there is no basis for attempt liability in the statute, no matter how desirable such liability may be as a matter of policy.

### 2. An offer to distribute does not constitute distribution

The recording companies disagree, arguing that although the term "distribution" is not explicitly defined by the statute, it is synonymous with the term "publication," which the statute defines to include "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101. Therefore, the argument goes, if Howell offered to distribute the copyrighted works to the public for purposes of further distribution, he distributed the works within the meaning of § 106(3). Some support for equating the two terms does exist.

The Supreme Court has observed that § 106(3) "recognized for the first time a distinct statutory right of first publication, which had previously been an element of the common-law protections afforded unpublished works." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 552 (1985). The Court noted that the legislative history of the statute confirms that "Clause (3) of section 106 establishes the exclusive right of publications." *Id.* (quoting H.R. No. 94-1476, at 62 (1976)). Relying on these

1  authorities, several courts have held that the terms publication and distribution are
2  synonymous, so where a defendant's act fulfills the definition of "publication" provided
3  by the statute, it also constitutes a "distribution" under § 106(3).  *See Agee v. Paramount*
4  *Communs.*, 59 F.3d 317, 325 (2nd Cir. 1995); *Ford Motor Co. v. Summit Motor Prods.,*
5  *Inc.*, 930 F.2d 277, 299 (3rd Cir. 1991); *Barker*, 2008 U.S. Dist. LEXIS 25913, at *18,
6  2008 WL 857527, at *5; *Atl. Recording Corp. v. Anderson*, Civil Action No. H-06-3578,
7  slip op. at 12–13 (S.D. Tex. Mar. 12, 2008); *Payne*, 2006 U.S. Dist. LEXIS 65765, at *11,
8  2006 WL 2844415, at *4; *In re. Napster*, 377 F. Supp. 2d at 803–04.  However, the
9  definition of "publication" provided by the statute is essentially a codification of case law
10 concerning the effect of first publication on an author's intellectual property rights.  *John*
11 *G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 36 (1st Cir. 2003)
12 (citing 1 NIMMER, supra, § 4.04 (2001)); *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d
13 1111, 1150 (C.D. Cal. 2007).  It is not clear that the terms "publication" and
14 "distribution" are synonymous outside the context of first publication, which was the
15 subject of discussion in *Harper & Row*.

16         As one court has put it, the definition of publication in § 101 of the statute makes
17 clear that all distributions to the public are publications, but it does not state that all
18 publications are distributions.  *London-Sire Records, Inc.*, 2008 WL 887491, at *10.  The
19 statute's definition of "publication" includes "distribution of copies . . . to the public" and
20 "offering to distribute copies . . . for purposes of further distribution."  The inverse
21 proposition, that all "publications" are "distributions," appears nowhere in the statute or
22 the legislative history.   Moreover, the definition of "publication" in § 101 is truly
23 unhelpful in explicating the meaning of the term "distribution" used in § 106(3).  Read as
24 the record companies suggest, the definition would state that a "distribution" is a
25 "distribution" or an "offering to distribute."  One cannot assume that the terms are
26 absolutely synonymous in the face of such an unsatisfactory definition.
27
28
- 12 -

The scope of the term distribution is only defined within § 106(3) itself, as a "sale or other transfer of ownership" or a "rental, lease, or lending" of a copy of the work. The plain meaning of that section requires an identifiable copy of the work to change hands in one of the prescribed ways for there to be a distribution. It is untenable that the definition of a different word in a different section of the statute was meant to expand the meaning of "distribution" and liability under § 106(3) to include offers to distribute. Courts should not impute such an oblique method to Congress. Rather, courts are to give meaning to Congress' choice to use the word "distribution" in § 106(3) rather than the expressly defined term "publication." *See Padash v. INS*, 358 F.3d 1161, 1169 n.7 (9th Cir. 2004) (refusing to "import the definition" of one term onto another because "the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words"). A plain reading of the statute indicates that a publication can be either a distribution or an offer to distribute for the purposes of further distribution, but that a distribution must involve a "sale or other transfer of ownership" or a "rental, lease, or lending" of a copy of the work. The recording companies have not proved an actual distribution of 42 of the copyrighted sound recordings at issue, so their motion for summary judgement fails as to those recordings.

### 3. Howell may not be responsible for any distribution

The recording companies' investigator, MediaSentry, did download 12 of the copyrighted sound recordings from Howell's computer. The recording companies assert that they have proven actual distribution for at least those 12 recordings. Amicus curiae, Electronic Frontier Foundation ("EFF"), responds that a copyright owner cannot infringe its own copyright, so its agent also cannot infringe the copyright owner's rights when acting on the owner's behalf. But the recording companies obviously did not intend to license MediaSentry to authorize distribution or to reproduce copies of their works. Rather, "the investigator's assignment was part of [the recording companies'] attempt to stop [Howell's] infringement," and therefore the 12 copies obtained by MediaSentry are

- 13 -

unauthorized. *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1348 (8th Cir. 1994) (citing other instances of "investigative schemes that have been upheld in other copyright enforcement cases"). *See also Leadbetter*, 2007 U.S. Dist. LEXIS 29818, at \*12–13, 2007 WL 1217705, at \*4 (accepting that distribution to a copyright holder's investigator would be a copyright violation). EFF has not cited a single case to the contrary. The closest they come is a case that states that a copyright owner cannot prove *actual* damages if infringing copies were sold only to the owner's agent. *Higgins v. Detroit Educ. TV Found.*, 4 F. Supp. 2d 701, 705 (E.D. Mich. 1998). In this suit, the recording companies have requested statutory damages, not actual damages, and it is well recognized that "[a] plaintiff may elect statutory damages 'regardless of the adequacy of the evidence offered as to his actual damages.'" *Columbia Pictures Indus. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001) (citing NIMMER, supra, § 14.04 (2000)).

Nevertheless, the record in this case does not conclusively indicate that Howell was responsible for making the 12 downloaded recordings publicly available. A reasonable trier of fact could conclude that it was Howell who placed the copyrighted files into his shared file folder; Howell admitted that he downloaded KaZaA onto the computer, that he created the KaZaA user account through which the files were made available to the public, and that he authorized sharing other types of files. On the other hand, Howell has sworn that he did not place the copyrighted sound recordings in the shared folder, has testified that other users of the computer could be responsible, and has identified evidence purportedly showing that the Kazaa program was, without his authorization, making files not in the shared folder available for download. Viewing all the evidence in the light most favorable to Howell, there exists a disputed issue of fact regarding Howell's responsibility for sharing the files. Accordingly, the recording companies' motion for summary judgment is also denied with respect to the 12 copies downloaded by MediaSentry.

- 14 -

### 4. Insufficient evidence of primary versus secondary liability

The recording companies motion for summary judgment also fails because they have not proved that a KaZaA user who places a copyrighted work into the shared folder distributes a copy of that work when a third-party downloads it. Under their theory, a KaZaA user transfers a copy of the work to a third party and is therefore liable as a primary infringer of the distribution right. However, in the KaZaA system the owner of the shared folder does not necessarily ever make or distribute an unauthorized copy of the work. The owner certainly does not distribute the copy that resides in the shared folder, for that copy never leaves its location on the owner's hard drive. Rather, a copy of the copy in the shared folder is made.

If the owner of the shared folder simply provides a member of the public with access to the work and the means to make an unauthorized copy, the owner is not liable as a primary infringer of the distribution right, but rather is potentially liable as a secondary infringer of the reproduction right. *See* PATRY, supra, § 13:11.50 at 13-26 to 13-27 (explaining that technically, "third parties are reaching into the individuals' hard drive and taking an electronic file," so "the individual who has the work on his or her hard drive [can potentially be sued] for contributory infringement of the reproduction right" but not primary infringement of the distribution right). The courts and commentators have recognized that making a copyrighted work and the facilities to copy it available to another implicates contributory, not direct, liability for copyright infringement. 3 NIMMER, supra, § 12.04[A][3][b], at 12–87 (2007). For example, where a business rents customers video cassettes and a room for viewing the cassette, the business is liable for contributory infringement, not direct infringement, of a copyright holder's public performance right. *Columbia Pictures Indus., Inc. v. Aveco, Inc*, 800 F.2d 59, 62 (3rd Cir. 1986).

The recording companies' motion is based solely on Howell's direct liability for violating the distribution right. Their motion fails because they have not explained the

1 architecture of the KaZaA file-sharing system in enough detail to determine conclusively
2 whether the owner of the shared folder distributes an unauthorized copy (direct violation
3 of the distribution right), or simply provides a third-party with access and resources to
4 make a copy on their own (contributory violation of the reproduction right).  *See A&M*
5 *Records v. Napster, Inc.*, 239 F.3d 1004, 1012 (9th Cir. 2001) (explaining that in the
6 Napster system, it is the requesting user's computer that establishes a connection with the
7 host user and downloads a copy of the contents).

8 Furthermore, if contributory liability applies, the recording companies must still
9 prove that a third-party actually obtained an unauthorized copy of the work to impose
10 liability on Howell.  The statutory basis for such contributory liability is found in the
11 Copyright Act of 1976's provision to a copyright holder of the exclusive rights "to do and
12 to authorize" certain acts listed in § 106, including distribution.  17 U.S.C. § 106.  Our
13 circuit has noted that use of the phrase "'to authorize' was simply a convenient peg on
14 which Congress chose to hang the antecedent jurisprudence of third party liability."
15 *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1093 (9th Cir. 1994)
16 (quoting 3 NIMMER, supra, § 12.04[A][3][a], at 12-84 n.81 (1993)).  It "was not meant to
17 create a new form of liability for 'authorization' that was divorced completely from the
18 legal consequences of authorized conduct."  *Id.* at 1092.  Our circuit therefore agrees that
19 a defendant can only be held contributorily liable if a direct or primary infringement has
20 been proved.  *Id.* (citing extensive support for this conclusion), *accord Latin Am. Music*
21 *Co. v. Archdiocese of San Juan*, 499 F.3d 32, 46 (1st Cir. 2007) (citing *Venegas-*
22 *Hernandez v. ACEMLA*, 424 F.3d 50, 57–59 (1st Cir. 2005)).

23 **IV.  Conclusion**

24 The court is not unsympathetic to the difficulty that Internet file-sharing systems
25 pose to owners of registered copyrights.  Even so, it is not the position of this court to
26 respond to new technological innovations by expanding the protections received by
27 copyright holders beyond those found in the Copyright Act.

28

- 16 -

> The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme. Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology. In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests.

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984) (citations omitted).

IT IS THEREFORE ORDERED that the Motion for Summary Judgment (Doc. # 30) is denied.

DATED this 28th day of April, 2008.

_____
Neil V. Wake
United States District Judge

- 17 -